E-FILED
Monday, 03 August, 2020 02:24:35 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-CR-30112 |
| ) | |
| RICHARD ELDRIDGE, ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' RESPONSE OPPOSING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

The United States Attorney for the Central District of Illinois, John C. Milhiser, and Assistant United States Attorney Crystal C. Correa, hereby responds in opposition to the defendant's motion for compassionate release.

The novel coronavirus is spreading broadly among the U.S. population, including among members of the public, health-providers, law-enforcement officers, people who produce and deliver essential products, and those who carry out the functions of the federal, state, and local government. Both because of illness, and efforts to avoid having people become infected, the coronavirus pandemic is limiting the functions of essential businesses and

government. Against that backdrop, the defendant seeks to be released from prison under the compassionate release provision in 18 U.S.C. §3582(c)(1)(A)(i) as a means to control the spread of the coronavirus within prison. Compassionate release is reserved to those that present "extraordinary and compelling reasons" warranting a reduction of their sentence. The defendant has failed to do so. The defendant's motion is frivolous and without merit and should be denied.

## BACKGROUND

On October 3, 2007, a criminal complaint was filed against the defendant and a co-defendant, Bradley Clark. The complaint stemmed from an incident that occurred in the early morning hours, approximately 1:25 a.m., on June 14, 2007. Illinois State Police agents were conducting surveillance of anhydrous ammonia tanks at the FS Plant in Medora, Illinois. Anhydrous ammonia was commonly stolen and used to manufacture methamphetamine. While conducting surveillance, agents observed a vehicle drive up to one of the anhydrous tanks.

The driver of the vehicle was identified as the defendant. Agents approached the vehicle and identified themselves as law

enforcement. The defendant exited the vehicle, while his co-defendant, Clark, reached for an AR-15, which was modified from semi-automatic to fully-automatic. Clark pointed the rifle at the agents. Clark was shot by agents and survived. Clark was later discovered to be wearing a bulletproof vest.

Nearly 20 grams of pseudoephedrine along with other items used to manufacture methamphetamine were recovered from the car.

On November 7, 2007, an indictment was returned against the defendant. (R. 1)[1] Count 1 of the indictment charged that on or about June 14, 2007, the defendant knowingly and intentionally conspired with the co-defendant to manufacture a controlled substance, namely 5 grams or more of methamphetamine in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (b)(1)(B). Count 2 charged that on or about June 14, 2007, the defendant knowingly and intentionally possessed a firearm in furtherance of and carried a firearm during and in relation to a drug trafficking crimes in violation of Title 18, United States Code, Section 924(c). Count 3 charged that on or about June 14, 2007, the defendant was a felon in possession

---

[1] Our citations to the record use the following abbreviations: "d/e" means "docket entry"; "R." followed by a number refers to a document or transcript in the record bearing that number on the district court's docket sheet and "PSR" refers to the presentence investigation report.

3

of a firearm, in violation of Title 18, United States Code, Section 922(g).

On May 14, 2008, an 851 notice was filed providing the defendant with notice of prior drug convictions used to enhance his sentence. (R. 17) Those prior convictions included a 1999 conviction for chemical breakdown of a controlled substance, two 2000 convictions for possession of a controlled substance, a 2003 conviction for possession of a controlled substance, and a 2004 conviction for possession of a controlled substance.

On August 5, 2008, the defendant entered into a plea agreement in which he agreed to plead guilty to counts 1 and 2 of the indictment. (R. 29) The stipulation of facts in the plea agreement referenced the facts as laid out in the criminal complaint affidavit, summarized above in this response.

On November 28, 2008, the defendant was sentenced to 188 months on count 1 and 84 months on count 2, to run consecutively. (R. 36) The defendant was also sentenced an 8-year and 5-year term, respectively, of supervised release, to be served concurrently.

The defendant was sentenced to a bottom of the guideline sentence for both counts 1 and 2. PSR ¶ 94. The defendant's criminal

history category of VI was driven by a criminal history score of 27 points. PSR ¶ 59. The defendant's offense level, after acceptance of responsibility, was 31. PSR ¶ 32. The offense level included a 6-point enhancement because the defendant's co-conspirator pointed a machine gun at law enforcement after they identified themselves. PSR ¶ 25.

On May 20, 2020, the defendant completed a "Request for Administrative Remedy." The defendant stated, "due to the COVID 19 pandemic I am requesting a review of my circumstances. I'm at the end of my sentence with 13 years in and 4 left to serve. I have a sister struggling and 2 children that could use my help. I also don't want to chance catching this virus." The defendant also stated, "due to the COVID 19 pandemic, I would like to see if I could get home confinement. I'm at the end of my hit and just don't want to chance anything."

On July 16, 2020, Warden Hemingway denied the defendant's request. See Government's Exhibit 1. The Warden noted that the defendant's PATTERN score exceeded a high score, where priority is given to those with lower scores. Of significance in both the

defendant's requests and the Warden's response, is that there are no health concerns.

## RESPONSE

### I. The Defendant Cannot Establish Extraordinary and Compelling Reasons to Warrant a Reduction.

The defendant's only argument in his amended motion for modification of sentence is that the defendant has a BMI of 29. Def. Mtn. p. 1. The defendant is 5'7" and weighs 185 pounds.

The defendant has failed to establish an "extraordinary and compelling reasons to warrant such a reduction" under 3582(C)(1)(A)(i). Under the relevant provision of §3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. §3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG §1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot

independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A)."). [2] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to the BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria the BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic

---

[2] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

The BOP is undertaking extensive measures to address the spread of coronavirus within prison facilities. It would be more dangerous for the defendant, and the community, to release the defendant into the community at this time. In addition to prioritizing home confinement under 18 U.S.C. §3624(c)(2), as amended by §12003(b)(2) of the CARES Act, the BOP has taken a number of steps to prioritize the health and safety of inmates. In February 2020, the BOP "began planning for its COVID-19 response and instituted a comprehensive management approach for oversight of the situation" that "includes all the BOP Regional Offices, all the BOP Central Office Divisions (which oversee program level functions), and the National Institute of Corrections (NIC) that coordinates with state and local prisons and jails." The BOP's COVID-19 Response, https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_response (last accessed July 1, 2020). Along with implementing "its approved Pandemic Influenza Plan," the BOP is "utilizing the guidance and directives from the World Health Organization (WHO), the Centers for Disease Control (CDC), the Office of Personnel

Management (OP), DOJ and the Office of the Vice President." *Id.* Like many other government agencies, the BOP is conducting "daily briefings and provid[ing] updates to senior management" to implement evolving guidance on matters including "inmate and staff screening tools," "CDC best practices," and "BOP's Personal Protective Equipment (PPE) inventory." *Id.* Regarding PPE, the BOP has completed review of its infectious disease supplies and is executing "[a] national acquisition plan … to obtain bulk purchase, stockpile supplies and coordinate distribution." *Id.*

The BOP has also implemented a modified operations plan to mitigate the spread of the coronavirus. https://www.bop.gov/coronavirus/covid19_status.jsp. Under this plan, all social visits and inmate internal movements have been suspended, with the exception of movements required by the federal judicial system, or needed to maintain the health and safety of inmates by, for example, limiting overcrowding. *Id.* In-person legal visits have been temporarily suspended, with allowances for confidential legal calls. *Id.* Inmates have also been given an additional 500 telephone minutes per calendar month to facilitate safe social contact. *Id.* The BOP has implemented screening measures for staff,

inmates, and contractors performing essential services and maintenance, and has adopted a "modified operations plan to maximize social distancing in [its] facilities, as much as practicable." *Id.* For example, modified operations can include staggered meal and recreation times designed "to limit congregate gatherings." *Id.* The BOP has also suspended all non-essential staff training and all staff travel, excepting relocation travel. *Id.* Furthermore, the BOP continues to screen inmates for COVID-19. *Id.* More specifically, "all newly arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms; [a]symptomatic inmates with exposure risk factors are quarantined; symptomatic inmates with exposure risk factors will be isolated and tested for COVID-19 per local health authority protocols." *Id.*

The BOP is also monitoring and reporting daily on COVID-19 cases identified in its facilities. COVID-19 Cases, https://www.bop.gov/coronavirus/index.jsp (updated daily at 3:00 p.m.). The defendant is housed in FCI Milan, located in Michigan. As of August 2, 2020, the facility had 2 positive inmates, 1 positive staff member, and 3 inmate deaths. The vast majority of cases resolved

positively, with 98 inmates and 55 staff recovering from the virus. *Id.* The facility holds 1,374 inmates.

While it is certainly true that the BOP—like nearly every community— is affected by the spread of the coronavirus, it does not follow that inmates are necessarily at greater risk than members of the general public. The BOP has implemented significant protective measures and, through increased use of home confinement and continued evaluation of compassionate release, is actively seeking to remove the most vulnerable and least dangerous to safer alternative settings. Regardless of whether a particular inmate is released under these programs, the BOP's efforts to curb the spread of disease will only serve to better protect the health of all federal inmates to the extent reasonably possible amid this pandemic. In fact, based upon the number of total federal inmates who have, or have had, COVID-19 as of August 2, 2020, is 2,430 (2,325 inmates are positive, nationwide; 8,256 inmates have recovered, and 105 inmates have died). A total of 10,686 inmates have neither had, currently have or have passed away from COVID-19. There are a total of 128,601 inmates in BOP custody. Only 8.3% of the BOP population have tested positive for COVID-19. Less than .8% of the BOP inmate

population have died due to COVID-19. Compared to Illinois, this figure is significantly lower. As of August 3, 2020, Illinois has 183,241 confirmed cases and 7,526 deaths due to COVID-19. COVID-19 Statistics, Illinois Department of Public Health, https://dph.illinois.gov/covid19/covid19-statistics. This means 4.1% of individuals who tested positive in Illinois have died from the virus.

While FCI Milan experienced COVID-19 cases, it is evident that their mitigation efforts are substantially reducing the risk of infection in their facility. There are currently only 2 positive inmates and 1 positive staff member. Although there have been 3 deaths at the facility, a total of 156 inmates and staff contracted the virus. Of that number, 153 have recovered, a recovery rate of 98%, which remains higher than the current 95% recovery rate for Illinois.

## II. Under the Factors Listed in 18 U.S.C. §3553 the Defendant Should Not be Released

The defendant was sentenced to a 272-month sentence for a serious drug offense that included the possession of an automatic rifle.

Although the defendant did not have the automatic AR-15 in his hands at the time of the offense, it is a distinction without a difference. The defendant and his co-conspirator went to steal anhydrous and were prepared to potentially shoot and kill someone. His co-conspirator, even after ISP agents announced their office, readied the rifle by pointing it the agents.

The defendant is a real danger to the community if he is released. His criminal history includes arrests and convictions for numerous unlawful possession of controlled substances, along with offenses of domestic battery, resisting an officer, criminal damage to property, burglary, and driving on a revoked license. PSR ¶¶ 36-56. As noted above, the defendant had a criminal history score of 27 points. PSR ¶ 59. The minimum points required to be a category VI, is 13 points. The defendant exceeded that by an additional 14 points. The defendant's entire adult life has been marked by numerous arrests and convictions.

The defendant's history and risk to the community far outweigh the reason he presents to the Court as a basis for his release. The defendant's BMI of 29, is not even categorized as a risk factor under the CDC guidelines. Only a BMI score of 30 or higher presents a risk.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html. The government would also note that based on the defendant's medical records dating back to 2013, the defendant consistently weighed about 175 pounds and was very physically active including playing sports. See Government Exhibit 2. Even at 175 pounds, at the defendant's height, a BMI of 27.4 puts him in the "overweight" category. However, BMI is a general calculation and isn't specific to each individual. For example, "a football player or a body builder who is very muscular. Their BMI shows up pretty high, and yet their body fat is actually pretty low." See WedMD, "What Your BMI Doesn't Tell You," Katherin Kam https://www.webmd.com/diet/features/bmi-drawbacks-and-other-measurements#1 (last accessed August 3, 2020).

The defendant's BOP medical records dating back to 2013, paint a picture of an otherwise healthy individual, someone who is physically active, and is at a lower risk of developing complications from COVID-19.

The defendant's original request to the BOP did not involve any medical issues or concerns, and the defendant's amended motion is

merely grasping to find some relevant medical reason. However, the truth is, there simply is not one to find.

Based upon the foregoing, the United States contends the defendant's motion should be denied.

>Respectfully Submitted,
>
>JOHN C. MILHISER
>UNITED STATES ATTORNEY
>
>By:   */s/ Crystal C. Correa*
>　　　Crystal C. Correa, IL Bar No. 6307734
>　　　Assistant United States Attorney
>　　　United States Attorney's Office
>　　　318 South 6th Street
>　　　Springfield, IL 62701
>　　　Telephone: (217) 492-4450
>　　　Email:  Crystal.Correa@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on August 3, 2020, I caused the government's response to be filed with the Clerk of the Court using the CM/ECF system and will send notification to the following counsel of record: Johanes C. Maliza, Assistant Federal Public Defender.

*/s/ Crystal C. Correa*
Crystal C. Correa
Assistant United States Attorney